IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WANDA ARANA                    :          CIVIL ACTION
                               :
          v.                   :
                               :
TEMPLE UNIVERSITY HEALTH SYSTEM :          NO. 17-525

MEMORANDUM

Bartle, J.                                     May 3, 2018

          Plaintiff Wanda Arana ("Arana") brings this action
under the Americans with Disabilities Act ("ADA"), 42 U.S.C.
§§ 12101 et seq., the Family Medical Leave Act ("FMLA"),
29 U.S.C. §§ 2601 et seq., and the Pennsylvania Human Relations
Act ("PHRA"), 43 Pa. Stat. §§ 951 et seq.  She alleges that her
former employer defendant Temple University Health System
("Temple") failed to provide her a reasonable accommodation,
discriminated and retaliated against her, and interfered with
her rights under the FMLA.  Before the court is the motion of
Temple for summary judgment under Rule 56 of the Federal Rules
of Civil Procedure.

I

          Under Rule 56 of the Federal Rules of Civil Procedure,
summary judgment is appropriate "if the movant shows that there
is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a);
see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A

dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the nonmovant. See id. at 252.  We view the facts and draw all inferences in favor of the nonmoving party.  See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

II

The following facts are not in dispute or are viewed in the light most favorable to Arana, the nonmoving party.  In October 2007, Temple hired Arana as an Access Specialist in Temple's former Call Center.  She was supervised by Kimberly Lloyd, the Call Center Manager, and Joseph Alfonsi, Director of the Call Center.

In 2012, Temple partially eliminated the Call Center. At that time, Arana was transferred to the newly-created twenty-four hour Temple Access Call Center as a Call Center Specialist.  Arana's supervisors became Anita Mitchell and Steve Lauer, who both held the title of Call Center Manager.  Alfonsi remained as Director.

Throughout her employment with Temple, Arana worked the night shift from 12:00 a.m. to 8:30 a.m.  Between two and four Call Center Specialists were assigned to that shift on any

given night.  As a Call Center Specialist, Arana was required to send and receive calls within Temple's hospitals.  The calls included paging doctors, checking on patient status, and fielding general inquiries.  Arana was also responsible for handling "STAT" calls, which are emergency calls for urgent patient care or for security issues.  Her job was an extremely significant one.  The lives of patients could depend on Arana and others in that position being at their posts and fulfilling their assigned duties.

Arana would receive approximately 50-100 calls during a shift.  Call Center Specialists must be logged into their computer to receive calls.  Specialists receive a forty-five minute lunch break and another fifteen minute break each shift, which they are allowed to combine for an hour-long break.

Arana suffers from migraines which make her sensitive to lights and computers and cause her to experience throbbing and dizziness.  She also has diabetes and in March 2015 was diagnosed with diabetic ketoacidosis, a potentially life-threatening complication which can result in sweating, vomiting, nausea, diarrhea, shakiness, weakness, headaches, severe pain, and dry mouth.  Sometime in May of 2015, she was diagnosed with gastroparesis, another complication of diabetes resulting in delayed stomach emptying and slow transit of food

through the gastrointestinal tract, which can cause abdominal pain, nausea, and vomiting.

Throughout her time at Temple, Arana requested and was granted FMLA leave due to her various medical conditions. Arana received FMLA leave from February 22, 2010 through March 7, 2010 for a surgical procedure. Later, Arana obtained intermittent FMLA leave for the period of August 8, 2012 through February 8, 2013 for her migraines. In 2015, Arana had FMLA leave for the period of March 20 through April 6, 2015. During this time she was hospitalized due to stomach issues associated with her diabetic ketoacidosis and gastroparesis. Arana was cleared to return to work on April 6, 2015 but thereafter was granted intermittent FMLA leave for the period of April 7, 2015 through October 7, 2015. The corresponding medical certification completed by Arana's physician states that Arana would need to be absent from work during flare-ups in her condition. Pursuant to this certification, Arana took FMLA leave on May 16, May 23, June 5, June 9-11, and July 7, 2015. Arana also left work early several times when she did not feel well.

Mitchell, Lauer, and Alfonsi were all aware of Arana's FMLA leave. In addition, Arana discussed her medical condition with Mitchell in March 2015, after she was hospitalized for severe vomiting. Mitchell kindly assisted Arana with making medical appointments and arranged for Arana to meet with another

employee to discuss diabetes management. At Arana's request, Mitchell helped Arana avoid a long wait in the Temple emergency room on May 3, 2015 by having Arana placed at the top of the priority list at the emergency room. Arana also discussed her condition with Alfonsi during her annual review in June 2015. Alfonsi inquired as to Arana's diagnosis and symptoms and stated "off the record, I think you should take some—take a short leave of absence until you get yourself together—get better."[1]

When taking intermittent leave, Arana would provide notice to her supervisors several hours before the start of her shift to enable them to find coverage for her. Prior to notifying her supervisor that she was not coming to work, Arana would contact other employees to ask if they could work her shift. Arana felt pressured to do so because her supervisors generally would inquire if there was such coverage whenever she was unable to work. However, Arana knew that she was not required to do so under Temple policy. Arana further admits that none of her supervisors ever directed her to look for coverage and that she did in fact use FMLA leave at times when she did not know whether there was coverage for her shift.

According to Arana, she "felt like it was an inconvenience" for Temple when she took FMLA leave. In

---

1. Alfonsi denies this conversation occurred but we take this fact as true for purposes of this motion.

particular, she states that Lauer implied that Arana was taking advantage of her FMLA leave. Arana further states that when she attempted to call out on intermittent FMLA leave on a weekend in April or May of 2015, she was told by Lauer "there's no coverage. You have to come in." Lauer was working from home at the time due to a terminal illness and died shortly thereafter. As a result of her conversation with Lauer, Arana reported to work. She later spoke with an individual in Temple Human Resources regarding the incident but did not complete a Temple Health Workplace Complaint Form. Arana was informed that Human Resources would speak with Alfonsi. Arana did not identify any other instance in which she requested but was denied FMLA leave.

The parties agree that Arana had a history of poor performance and disciplinary issues that spanned the entirety of her employment at Temple. From 2008 through 2015, she received numerous Correction Action/Discipline Reports ("CADs") for failing to follow Temple protocols when handling calls, for providing incorrect information to patients, for committing numerous scheduling and registration errors, and for excessive lateness. She also received CADs for mishandling STAT calls. On several occasions Arana responded to STAT calls incorrectly, on a delayed basis, or not at all.

Temple maintains a Corrective Action Policy, which provides for progressive discipline with several steps:

(1) discussion with the employee and the creation of a performance improvement plan; (2) written warning; (3) final written warning; (4) one-day suspension without pay; and (5) termination.  Under Temple policy, however, certain infractions are considered "[g]ross neglect of duties including but not limited to job abandonment, patient abandonment or unauthorized sleeping on duty" and warrant immediate discharge.

Arana was first placed on a performance improvement plan in 2008 for failing to utilize Temple's protocol manual when handling calls.  On October 23, 2013 she received a written warning "for not meeting performance requirements specifically in the area of handling STAT calls."  On February 14, 2014, Arana received a written warning for violating Temple's Attendance and Lateness policy.  Arana was informed that she had accumulated eight incidents of lateness and that two additional incidents could result in a final written warning.  On March 18, 2014, Arana received a final written warning regarding her failure to follow proper protocol, including several errors with STAT calls.  Thereafter on March 11, 2015, Arana received a one-day suspension for her continued failure to follow proper protocols.  At that time Arana was advised that "[i]mmediate action is necessary, future occurrence will result in corrective action, up to and including termination."

On July 21, 2015, Alfonsi received a complaint from a nurse that she was having trouble getting through to the Call Center. He thereafter reviewed the Call Center records for that day and identified an hour and forty minute gap in Arana's log-in report, wherein Arana was logged out of her computer from 5:18 a.m. until 6:58 a.m. Arana admits that she was absent for an additional forty minutes and further states she was in the bathroom vomiting during this time. In his review Alfonsi identified another unexplained gap of time on July 22, 2015 and "start[ed] to see a pattern that [Arana] wasn't coming back from her break at an hour and she wasn't logged into the phone."

On July 24, 2015, Arana failed to return from a break on time. Mitchell discovered her in a conference room. According to Mitchell, Arana was asleep but awoke after Mitchell entered the room. Arana denies that she was asleep but admits that she was slumped in a conference room chair, under a blanket and with the lights off. Mitchell reported the incident to Alfonsi, who ultimately made the decision to terminate Arana on July 28, 2015 for job abandonment and unauthorized sleeping on duty. This conduct constituted gross neglect of duties under Temple policy and thus was grounds for immediate termination. Arana's termination notice stated in part:

> On 7/21/2015, we investigated an unusual
> spike in abandoned calls and an unusual
> delay in answering the telephone in the call

-8-

> center. After reviewing the log in/log out
> report and the call recording system, we
> identified that you did not log in after
> your lunch break and were missing from your
> work station during your scheduled time from
> 6am to 7am. As a result of your
> unauthorized absence from your work station,
> only one employee was answering the
> telephones during the period of time which
> created risk for patients at Temple Hospital
> and Episcopal Hospital. You did not notify
> your supervisor about this missed time.[2]
>
> On 7/24/2015, we noticed that you had not
> reported back from your lunch break. When
> we looked for you, we found you asleep in
> the conference room.

TUHS Corrective Action/Discipline Report (July 28, 2015)

(emphasis added). The notice included the dates on which Arana

had received prior discipline in the form of a first written

warning, a final written warning, and a suspension. It also

listed several recent occasions in May and June 2015 when Arana

had been coached about job performance.

Thereafter Arana commenced this action. The complaint

includes the following claims: (1) Count I—Failure to

Accommodate under the ADA; (2) Count II—Discrimination and

Disparate Treatment under the ADA; (3) Count III—Retaliation

under the ADA; (4) Count IV—Failure to Engage in the Interactive

Process in Good Faith under the ADA; (5) Count V—Interference

---

2. Arana informed Mitchell on July 22, 2015 that she had
exceeded her break time the day before because she had been in
the bathroom vomiting. It is unclear whether Mitchell conveyed
this information to Alfonsi.

under the FMLA; (6) Count VI—Discrimination and Retaliation
under the FMLA; and (7) Count VII—Disability Discrimination,
Retaliation, and Failure to Accommodate under the PHRA.

III

We begin with Arana's claims for failure to
accommodate and for failure to engage in the interactive process
under the ADA and the PHRA.[3]  Under the ADA, an employer commits
unlawful discrimination on the basis of disability by "not
making reasonable accommodations to the known physical or mental
limitations of an otherwise qualified individual with a
disability who is an applicant or employee, unless such covered
entity can demonstrate that the accommodation would impose an
undue hardship on the operation of the business of such covered
entity."  42 U.S.C. § 12112(b)(5)(A).  A reasonable
accommodation is defined as "[m]odifications or adjustments to
the work environment, or to the manner or circumstances under
which the position held or desired is customarily performed,
that enable an individual with a disability who is qualified to
perform the essential functions of that position."  29 C.F.R.
§ 1630.2(o)(1)(ii).

_____

3.  Although its statutory text differs, the PHRA has similarly
been interpreted to require an employer to provide reasonable
accommodations to disabled employees.  Our analysis of Arana's
ADA claim applies equally to her PHRA claim.  See Taylor v.
Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999).

-10-

The statutory text of the ADA itself does not refer to the "interactive process." Shapiro v. Twp. of Lakewood, 292 F.3d 356, 359 (3d Cir. 2002). However, applicable regulations provide:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). Failure to participate in the interactive process is not an independent claim but rather part of a failure to accommodate claim. Whelan v. Teledyne Metalworking Prods., 226 F. App'x 141, 147 (3d Cir. 2007).

To prevail on a failure to accommodate claim, a plaintiff must prove: (1) the employer had knowledge of the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking such accommodations or assistance; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Capps v. Mondelez Glob., LLC, 847 F.3d 144, 157 (3d Cir. 2017); Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 319-20 (3d Cir. 1999).

"The law does not require any formal mechanism or 'magic words' to notify an employer . . . that an employee needs an accommodation." Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 332 (3d Cir. 2003) (quoting Taylor, 184 F.3d at 313). However, the employee "must make clear that the [he/she] wants assistance for his or her disability." Id. (quoting Jones v. United Parcel Serv., 214 F.3d 402, 408 (3d Cir. 2000)). This is so because "neither the law nor common sense can demand clairvoyance of an employer." Id. at 331. Thus, to trigger the duty to engage in the interactive process, "the employer must know of both the disability and the employee's desire for accommodations for that disability." Taylor, 184 F.3d at 313.

Temple has conceded for purpose of this motion that Arana is disabled and that Temple had knowledge of this disability. Thus the present dispute centers on whether Arana requested accommodations or assistance for her disability. Arana admits that she did not expressly do so. Nonetheless, Arana asserts that she provided sufficient information to put Temple on notice that she required an accommodation and thereby triggered Temple's duty to engage in the interactive process.

Arana points to the fact that Mitchell assisted Arana by helping Arana to obtain a shortened wait time while at the emergency room on May 3, 2015 and reasons that this assistance put Temple on notice of Arana's desire for an accommodation.

This argument fails.  The record demonstrates that Mitchell's assistance with this emergency room visit, as well as Mitchell's assistance with scheduling medical appointments and with arranging for Arana to discuss diabetes management with another employee, were kind acts undertaken by Mitchell for Arana's personal benefit.  While they reflect a genuine desire to assist Arana, these acts do not represent "[m]odifications or adjustments to the work environment" which would enable Arana "to perform the essential functions of [her] position." 29 C.F.R. § 1630.2(o)(1)(ii).  The implementation guidelines of the Equal Employment Opportunity Commission ("EEOC"), the agency charged with implementing the ADA, provide that the obligation to provide reasonable accommodation "does not extend to the provision of adjustments or modifications that are primarily for the personal benefit of the individual with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9.  Relying on this guidance as well as the text of the ADA itself, courts have held that providing personal assistance to employees such as scheduling medical appointments does not constitute a reasonable accommodation.  See, e.g., Brookins v. Indianapolis Power & Light Co., 90 F. Supp. 2d 993, 1004 (S.D. Ind. 2000). Accordingly these actions are irrelevant to Arana's failure to accommodate claim.

Arana next maintains that her request for FMLA leave constituted a request for reasonable accommodation.  In Capps v. Mondelez Global, LLC, our Court of Appeals held that "a request for FMLA leave may qualify, under certain circumstances, as a request for a reasonable accommodation under the ADA."  847 F.3d at 156–57.  However, in Capps the Court affirmed the district court's order granting summary judgment in favor of the employer on the plaintiff's failure to accommodate claim.  Id. at 157. It reasoned:

> [E]ven assuming, arguendo, that Capps'
> requests for intermittent FMLA leave
> constituted requests for a reasonable
> accommodation under the ADA as well,
> Mondelez continued to approve Capps'
> requested leave, and indeed, Capps took the
> requested leave.  Thus, Mondelez provided
> and Capps received the accommodation he
> asked for.  There is clearly a lack of
> evidence to show that Mondelez did not make
> a good faith effort in accommodating Capps'
> request for intermittent leave.

Id.  The situation is the same here.  The record demonstrates that Arana was approved for, and took, FMLA leave throughout her employment with Temple.  Thus Arana's request for FMLA leave cannot be used to create a genuine dispute of material fact regarding whether Temple failed to provide reasonable accommodations or otherwise engage in the interactive process.

Arana also asserts that "extra time in the bathroom" or allowing Arana to nap at work could have been reasonable

-14-

accommodations.  However, Arana admits that she never asked

Temple for such accommodations.  Arana further stated at her

deposition that she was unable to work during a flare-up in her

condition and that nothing Temple could have done would have

made it easier or more comfortable for her to remain at work

during a flare-up.  Arana had already received intermittent FMLA

leave and was permitted to be absent from work or leave early

when ill.  She also could have taken consecutive FMLA leave to

deal with flare-ups until her diabetes was under better control.

Instead of requesting any further accommodation in

addition to her intermittent FMLA leave, Arana abandoned her

duties and was found asleep while she was scheduled to be

working.  The EEOC Enforcement Guidelines state:  "[s]ince

reasonable accommodation is always prospective, an employer is

not required to excuse past misconduct even if it is the result

of the individual's disability."  U.S. Equal Emp't Opportunity

Comm'n, Notice No. 915.002, Enforcement Guidance: Reasonable

Accommodation and Undue Hardship Under the Americans

with Disabilities Act, at 36 (2002),

https://www.eeoc.gov/policy/docs/accommodation.html.

Consequently, Temple was not required to excuse Arana's

unauthorized breaks simply because she now asserts that such

conduct was necessitated by her disability and could have been a

reasonable accommodation.  See, e.g., Dewitt v. Sw. Bell Tel.

Co., 845 F.3d 1299, 1316 (10th Cir. 2017); McElwee v. Cty. of
Orange, 700 F.3d 635, 641 & n.4 (2d Cir. 2012); Hill v. Kansas
City Area Transp. Auth., 181 F.3d 891, 894 (8th Cir. 1999).

The motion of Temple for summary judgment on Arana's
claims for failure to accommodate and for failure to engage in
the interactive process under the ADA and PHRA in Counts I, IV,
and VII will be granted.

IV

We turn next to Arana's claim for discrimination and
disparate treatment under the ADA and the PHRA.  Under the ADA,
employers are prohibited from "discriminat[ing] against a
qualified individual on the basis of disability in regard to job
application procedures, the hiring, advancement, or discharge of
employees, employee compensation, job training, and other terms,
conditions, and privileges of employment."  42 U.S.C.
§ 12112(a).

To establish a prima facie case of discrimination
under the ADA, a plaintiff must show: (1) she is a disabled
person under the ADA; (2) she is otherwise qualified to perform
the essential functions of the job, with or without reasonable
accommodations; and (3) she suffered an adverse employment
action because of her disability.  Taylor, 184 F.3d at 306
(citing Gaul v. Lucent Techs., 134 F.3d 576, 580 (3d Cir.
1998)); see also Turner v. Hershey Chocolate U.S., 440 F.3d 604,

-16-

611 (3d Cir. 2006).  Once a prima facie case has been
established, the burden of production then shifts to the
employer to articulate "a legitimate, nondiscriminatory reason"
for the adverse employment action.  Shaner v. Synthes, 204 F.3d
494, 500 (3d Cir. 2000).  Should the defendant carry this
burden, the plaintiff then must have an opportunity to prove
that the reasons offered by the defendant were pretext.  Id.
The burden of proof always remains with the plaintiff.  Id. at
500-01.

Temple concedes, for purposes of its summary judgment
motion, that Arana is disabled within the meaning of the ADA and
that she was otherwise qualified to perform the essential
functions of her position.  It is also without question that
Arana suffered an adverse action when she was terminated by
Temple.  However, Temple asserts that Arana cannot meet the
causation element of her prima facie case—namely that the
termination was because of Arana's disability.  Temple further
asserts that it had a legitimate, nondiscriminatory rationale
for Arana's discharge.

As noted above, Temple had produced evidence that it
terminated Arana for job abandonment and for sleeping on duty.
Under Temple policy both actions constitute gross neglect of
duties warranting immediate discharge.  Such a policy exists for
good reason.  A Call Center Specialist at a hospital is an

extremely important and responsible position.  As her dismissal
notice affirmed, failure to be at one's post to answer and
forward calls can place a patient's life at risk.

Arana contends that there is a genuine dispute as to
whether she was in fact sleeping on duty.  However, Arana admits
she was slouched in a chair under a blanket in a conference room
with the lights off.  If this is not sleeping, it certainly
looks like it.  An employer's honest belief that an employee
violated company policy is a legitimate, nondiscriminatory
justification for discharge.  See Capps, 847 F.3d at 152-53.  It
was reasonable for Temple to believe she was asleep under the
circumstances.  Therefore Temple need not prove that Arana was
actually asleep in order to prevail on its motion.

Arana further asserts that "[s]leeping on duty was
generally accepted and a permissible activity."  In support, she
cites to the testimony of two of her former coworkers, Tiffany
Liabhan and Christopher Shaw.  Arana's reliance is misplaced.
Liabhan stated that Call Center Specialists on the overnight
shift often slept while "on our break once we clocked out."
Shaw testified similarly.[4]  Here, Arana was terminated because
she was found asleep after her break had ended and she should
have been answering calls.  Temple has produced evidence that it

---

4.  In fact, Shaw testified that he would set an alarm on his
cell phone so as to avoid sleeping past the end of his break.

has terminated other employees, albeit in different positions, for the same offense.

Whether Arana was sleeping on the job is really beside the point, for Temple also cited job abandonment as a legitimate, nondiscriminatory reason for her discharge. Arana does not dispute that on July 21, 2015, she was absent from her workstation for forty minutes when she was scheduled to be on duty. During this time only one other Call Center Specialist was present and, as a result, some calls to the Center went unanswered. Again, this is a most serious matter. Lives of patients can often depend on a call being answered or forwarded. Under Temple policy such misconduct properly warranted immediate termination. Temple was under no obligation to excuse this incident simply because Arana informed her supervisor after the fact that she was in the bathroom ill. It is further noteworthy that Arana was already on the last step of Temple's progressive discipline policy when these events took place.

Arana also complains that, prior to her termination, she was subjected to "nitpicking" and called into her supervisor's office to discuss mistakes. Arana does not identify any employee who was treated more favorably but rather contends generally that the treatment she received from her supervisors worsened after her most recent use of FMLA leave began in March 2015. However, Arana had a well-documented

-19-

history of performance issues and disciplinary actions that

began in 2008 and spanned the entirety of her employment with

Temple.  Notably, Arana received a final written warning in

March 2014, nearly a year before she states she was subjected to

increased nitpicking.  Arana admits that she had "a history of

poor performance and disciplinary actions."[5]  Consequently, these

vague assertions cannot create a genuine dispute of material

fact with regard to Arana's discrimination claim.

Finally, Arana accuses Temple of spoliation of two

pieces of evidence and invites the court to draw a negative

inference on that basis.  She first raises the fact that Temple

failed to produce an Automated Call Distribution ("ACD") report

for July 25, 2015.  This report would show when Arana logged on

and off on the night leading to her termination.  Arana states

that "[c]onveniently, that report has gone missing and no one

can explain what happened to it."  In response, Temple explains

that the ACD report must be generated from data in Temple's

computer system and that data for the night in question was

purged as part of Temple's routine document management

practices, presumably before the duty to preserve such

---

5.  In response to defendant's statement of material facts,
Arana has admitted every infraction except for three instances
in which she states she "does not recall" or that she "cannot
admit or deny the truth of the statement."  At this stage of the
proceedings such assertions are insufficient to create a genuine
dispute of material fact.  See Bixler v. Cent. Pa. Teamsters
Health & Welfare Fund, 12 F.3d 1292, 1302 (3d Cir. 1993).

information arose.[6]  Because the destruction was a matter of

routine and does not indicate an intention to commit fraud or

suppress the truth, we decline to draw an adverse inference

against Temple.  See Brewer v. Quaker State Oil Ref. Corp.,

72 F.3d 326, 334 (3d Cir. 1995).

Arana also points to a series of text messages

exchanged between Arana and Mitchell.  On May 23, 2015, Arana

texted Mitchell, believing she was texting someone else, and

said:  "Im so pissed all she worried about was getting coverage

not hope u get better I'm so tired of."  The next page states "I

glad I went to HR I let them about her telling me I had to come

in even thou I have fmla.  He wasn't Happy about that."  Arana

asserts that Temple omitted a portion of the text messages when

it produced the messages in discovery.  Temple denies this

allegation.  Without more than Arana's bald accusation, we

decline to draw an adverse inference against Temple.  We further

note that Arana herself sent and received the text messages in

question and thus presumably had equal access to this evidence.

Temple clearly terminated Arana for job abandonment—a

gross neglect of duty.  There is no genuine issue of material

fact on this score.  Accordingly, the motion of Temple for

---

6.  Temple further explains that it did not run an ACD report
for this date around the time of Arana's termination because
Mitchell had observed Arana asleep after her break ended.

summary judgment on Arana's claim for discrimination and disparate treatment under the ADA and the PHRA in Counts II and VII of the complaint will be granted.[7]

V

In Counts III and VII of the complaint Arana brings claims for wrongful retaliation in violation of the ADA and the PHRA. Arana also alleges that Temple retaliated against her in violation of the FMLA in Count VI of her complaint.

The ADA provides in relevant part that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203. To establish a prima facie case of illegal retaliation under the ADA, a plaintiff must prove: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Fogleman v. Mercy

---

7. The analysis of Arana's discrimination claim under the ADA is the same as that under the PHRA. See Taylor, 184 F.3d at 306.

Hosp., Inc., 283 F.3d 561, 567–68 (3d Cir. 2002) (quoting Krouse
v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)).[8]

Similarly, to establish a prima facie case of
retaliation under the FMLA, the plaintiff must show that:
(1) she invoked her right to FMLA leave; (2) she suffered an
adverse employment action; and (3) the adverse action was
causally related to her invocation of rights under the FMLA.
Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302
(3d Cir. 2012).

After the plaintiff has established a prima facie
case, the burden of production then shifts to the defendant to
articulate a legitimate, nondiscriminatory reason for the
adverse action.  Capps, 847 F.3d at 151-52; Williams v. Phila.
Hous. Auth. Police Dep't, 380 F.3d 751, 759 n.3 (3d Cir. 2004).
If defendant meets that burden, the burden then returns to the
plaintiff to show that the reason offered by defendant is
pretext.  Capps, 847 F.3d at 151-52.

There is no dispute that Arana invoked her right to
FMLA leave.  We will assume that her request for FMLA leave
constituted a request for a reasonable accommodation and that
therefore such action constituted protected activity under the
ADA.  See Torres v. Cty. of Berks, No. 17-01890, 2018 WL 564406,

---

8.  The anti-retaliation provision of the PHRA is interpreted as
identical to the ADA provision.  Fogleman, 283 F.3d at 567.

at *7 & n.14 (E.D. Pa. Jan. 26, 2018). There is also no dispute that Arana suffered adverse action, namely termination.

However, Arana has failed to raise a genuine dispute of material fact that her termination was causally connected to any protected activity under the ADA and the FMLA. Arana used FMLA leave throughout her employment with Temple, beginning in 2010. As discussed above, she was terminated for job abandonment and for sleeping on duty after a long and well-documented history of performance issues. Even assuming that she raised a genuine dispute regarding her prima facie case, Temple has articulated legitimate, nondiscriminatory justifications for her discharge and Arana has not come forward with any evidence to suggest these reasons were pretext. Given the record presented here there is simply no evidence that Temple terminated Arana in retaliation for engaging in activity protected by the ADA or the FMLA.

The motion of Temple for summary judgment on Arana's claims for retaliation in Counts III, VI, and VII will be granted.

VI

Finally, we consider Arana's claim for interference under the FMLA as set forth in Count V of the complaint. Such claim requires proof of the following elements: (1) the plaintiff was an eligible employee under the FMLA; (2) the

-24-

defendant was an employer subject to the FMLA's requirements;
(3) the plaintiff was entitled to take FMLA leave; (4) the
plaintiff gave notice to the defendant of her intention to take
FMLA leave; and (5) the plaintiff was denied benefits to which
she was entitled under the FMLA. Ross v. Gilhuly, 755 F.3d 185,
191–92 (3d Cir. 2014).

Our Court of Appeals has "made it plain that, for an
interference claim to be viable, the plaintiff must show that
FMLA benefits were actually withheld." Id. at 192. For
example, in Callison v. City of Philadelphia, the employer
maintained a policy requiring an employee on sick leave to
remain at home except for personal medical needs and to notify
the employer when leaving home during regular work hours. 430
F.3d 117, 118 (3d Cir. 2005). The plaintiff was suspended after
leaving home and failing to notify his employer while on FMLA
leave. Id. at 118-19. The Court of Appeals affirmed the
district court's order granting summary judgment on the
plaintiff's FMLA interference claim. Id. at 120. In doing so,
the Court reasoned that the employer's policy neither conflicted
with the FMLA nor prevented employees from taking leave. Id.
As a result, the employer did not abrogate the plaintiff's FMLA
rights by placing him on suspension for violating the policy.
Id. at 121.

There is no dispute here that Arana was an eligible employee under the FMLA, that Temple is subject to the FMLA, that Arana was entitled to FMLA leave, and that she gave notice to Temple of her intention to take such leave. Temple maintains that Arana has not raised a genuine dispute of material fact regarding whether she was denied any benefits under the FMLA.

Arana asserts that her supervisors interfered with her FMLA leave by asking whether there was coverage for her shift when she called out from work on intermittent FMLA leave. She admits that Temple policy did not require her to look for coverage and, to the extent she did so, she acted voluntarily. Arana concedes that there were times when she stayed home from work even if she did not know whether there was coverage for her shift. The record also shows that Arana used FMLA leave throughout her employment with Temple. As in Callison, the fact that Arana voluntarily sought coverage for shifts prior to taking FMLA leave is insufficient to show that she was actually denied FMLA benefits as required to sustain an interference claim.[9] See 430 F.3d at 120-21.

---

9. Arana also points to the testimony of her former co-workers, Shaw and Liabhan, who stated that they felt similar pressure to find coverage for their shifts when calling out. There is no evidence that Shaw and Liabhan were attempting to utilize FMLA leave, and therefore their statements are irrelevant to Arana's claim.

Arana also contends that Temple interfered with her
FMLA rights by denying her request to use intermittent FMLA
leave on one weekend in April or May 2015, when Lauer, one of
her immediate supervisors, instructed Arana that she would have
to report to work because there was no coverage for her shift.
Lauer, as noted, died shortly thereafter.  In support of this
claim, Arana relies solely on her own deposition testimony.
Arana cannot pinpoint the date on which this incident occurred.
There is no evidence that Arana attempted to contact Alfonsi,
the Call Center Director, or any other Temple personnel about
her conversation with Lauer before reporting to work.  Although
she states that she complained to Temple Human Resources after
the fact, she cannot identify the person in Human Resources to
whom she spoke.  Nor did she submit a formal complaint.
Moreover, the record demonstrates that Arana took FMLA
throughout the time period in which this incident allegedly
occurred, including on May 16, May 23, June 5, June 9-11, and
July 7.

        To defeat summary judgment, a factual issue must be
both material and genuine.  See Anderson, 477 U.S. at 250-51.
Arana's self-serving testimony, when juxtaposed with the record
evidence showing that she took FMLA leave both before and after
this incident allegedly occurred, is insufficient for a rational
factfinder to conclude that Temple withheld FMLA leave from

Arana.  See id.; Johnson v. MetLife Bank, N.A., 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012) (citing Irving v. Chester Water Auth., 439 F. App'x 125, 127 (3d Cir. 2011)).  This one instance, by itself, cannot raise a genuine dispute of material fact regarding Arana's interference claim.

Accordingly, the motion of Temple for summary judgment as to Arana's claim for interference under the FMLA in Count V of the complaint will be granted.